IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TERRANCE STEVENSON

CRIMINAL CASE NO.

1:11-cr-00350-ODE-RGV

## ORDER FOR SERVICE OF FINAL REPORT, RECOMMENDATION, AND ORDER

Attached is the Final Report, Recommendation, and Order of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal

Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be

served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of receipt of this

Order. Should objections be filed, they shall specify with particularity the alleged

error(s) made (including reference by page number to the transcript if applicable)

and shall be served upon the opposing party. The party filing objections will be

responsible for obtaining and filing the transcript of any evidentiary hearing for

review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 7th day of March, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:11-cr-00350-ODE-RGV

TERRANCE STEVENSON

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Defendant Terrance Stevenson ("Stevenson") is charged in a three-count

indictment with knowingly obstructing, delaying, and affecting commerce by

unlawfully taking and obtaining property belonging to a McDonald's restaurant

from the restaurant's employee by means of actual and threatened force, violence,

and fear of injury, in violation of 18 U.S.C. § 1951(a); knowingly and willfully

attempting to take by intimidation, force, and violence United States currency from

bank employees at a Bank of America branch, in violation of 18 U.S.C. § 2113(a) and

(d); and taking a motor vehicle from the person and presence of another by force,

violence, and intimidation, in violation of 18 U.S.C. § 2119. [Doc. 1].[1] Pending

_____

[1] The listed document and page numbers in citations to the record refer to the
document and page numbers shown on the Adobe file reader linked to the Court's
electronic filing database, CM/ECF.

before the Court are Stevenson's motions to suppress statements and identification evidence. [Docs. 12 & 13]. Following an evidentiary hearing on November 21, 2011, on Stevenson's motions to suppress,[2] the parties filed post-hearing briefs, [Docs. 26 & 30], and the pending motions are ready for ruling. For the following reasons, it is **RECOMMENDED** that Stevenson's motions to suppress, [Docs. 12 & 13], be **DENIED**.

## I. STATEMENT OF FACTS

**A.     The June 6, 2011, Photographic Lineup**

On the morning of June 6, 2011, DeKalb County Police Department ("DCPD") Detective Ray Davis ("Detective Davis"), along with DCPD Detective C.K. Houlroyd ("Detective Houlroyd"), and other DCPD detectives, responded to a call regarding an attempted robbery at a Bank of America branch located at 1698 Mountain Industrial Boulevard. (Tr. at 26-28). Upon their arrival, officers already at the scene of the attempted bank robbery advised the DCPD detectives that there had also been an incident across the street at the Hampton Inn hotel where the suspect had fled after the attempted bank robbery and carjacked a vehicle. (Tr. at 27). While

---

[2] See [Doc. 24] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)."

Detective Houlroyd investigated the carjacking incident that occurred at the Hampton Inn, Detective Davis obtained a physical description of the suspect after interviewing the bank witnesses and reviewing Bank of America's video surveillance tapes that depicted the suspected bank robber.  (Tr. at 27-28). Thereafter, the DCPD detectives were able to associate a name with the suspect based on Detective Houlroyd's investigation at the hotel and identified Stevenson as the suspect.  (Id.).[3]

Later that same day, Detective Davis prepared a six-picture photo array, which contained Stevenson's photograph, and showed the array to three witnesses from the bank and one witness and one victim from the Hampton Inn incident.[4] (Tr. at 27-29, 35-36, 39-40).  Prior to showing the photo array to the five individuals, Detective Davis met with each of them separately and ascertained that they had in fact seen the suspect and then he read each of them a standard photo lineup admonishment, which states in relevant part:

---

[3] Specifically, Detective Houlroyd's investigation revealed that the suspect may have stayed in a room at the Hampton Inn that was registered to Stevenson. (Tr. at 27-28, 40).

[4] Detective Davis testified that he used a photo of Stevenson from a prior arrest by another agency within DeKalb County in the array, which consisted of six black and white photos of black males with similar hairstyles who were also similar in age.  (Tr. at 28, 41; Gov. Ex. 3).  Detective Houlroyd was present when Detective Davis showed the array to the witnesses.  (Tr. at 29).

In a moment, I am going to show you a group of photographs that may or may not contain a picture of a person involved in the crime now being investigated.

The fact that photographs are being shown to you should not cause you to believe that anyone has been or will be arrested.

Remember: when viewing a group of photographs you should consider the lighting and how it might affect the complexion of some persons, making them appear lighter or darker. You should also consider the fact that hair styles, facial hair, scars, marks, etc. can easily be changed, added, or taken away. Finally, do not allow yourself to be distracted by any background scenery since photographs are sometimes taken at various locations or obtained from a variety of sources.

Please take your time and study the photographs carefully. Do not allow yourself to be influenced by any police officer present. Once you have viewed the photographs, you will be asked to record your viewing.

(Tr. at 29-33, 36-37; Gov. Ex. 2). None of the individuals had any questions regarding the admonition, and in fact, each of them acknowledged that they understood the procedures. (Tr. at 32). Detective Davis then showed each individual the photo array,[5] and two of them were unable to recognize the suspect,

---

[5] Specifically, Detective Davis showed the photo array to the first individual at 2:05 p.m., the second individual at 2:20 p.m., the third individual at 2:23 p.m., the fourth individual at 2:27 p.m., and the fifth individual at 2:45 p.m. (Tr. at 32; Gov. Ex. 2). There is no evidence that any of the individuals had an opportunity to discuss the photo array with each other prior to making their selections. (Tr. at 33, 37-38). In fact, Detective Davis testified that he specifically advised each individual not to talk amongst themselves about the photographic lineup until the investigation was complete. (Tr. at 37).

two identified the second photograph, which was of Stevenson, and one chose the fourth photograph. (Tr. at 33; Gov. Exs. 2 & 3). Detective Davis testified that he did not in any way or manner suggest to the individuals which photograph they should choose. (Tr. at 34).

## B.    Statements made on June 7, 2011

On June 7, 2011, at approximately 8:30 a.m., Detective Marlea McBride ("Detective McBride") of the Opelika Police Department in Opelika, Alabama, responded to a call regarding a carjacking of four elderly women at gunpoint. (Tr. at 4-6, 20). After Detective McBride arrived at the scene, it was determined that the carjacked vehicle, a Chevy Cobalt, was equipped with OnStar capabilities, and the vehicle was tracked to Coweta County, Georgia, within the hour. (Tr. at 5-6). Thereafter, Coweta County Sheriff's deputies located the vehicle with the suspect, later identified as Stevenson, still inside. (Tr. at 7, 10).

Subsequently, Detective McBride, accompanied by Detective Hamby, drove to the Coweta County jail where Stevenson was being detained. (Tr. at 7). When they arrived at the jail, Detectives McBride and Hamby were taken to an interview room, which was approximately twelve feet by eight feet and was furnished with a table in the middle, and they were joined by Stevenson, who was escorted to the interview room by Coweta County Sheriff's deputies. (Tr. at 7-8, 13, 20). Detectives

McBride and Hamby, who were dressed casually and unarmed, sat on one side of the table while Stevenson, who was dressed in jail clothes and handcuffed with his hands behind his back,[6] sat across from them. (Tr. at 8-10, 19, 24).

Prior to interviewing Stevenson, Detective McBride advised Stevenson of his Miranda[7] rights in Detective Hamby's presence by reading these rights from a standard form.[8] (Tr. at 12; Gov. Ex. 1). Specifically, Detective McBride advised Stevenson that he had the right to remain silent; that any statements he made could be used against him in court; that he had the right to speak to an attorney, to have one present during the questioning, and to have one appointed for him if he could not afford one; and that in the event he proceeded with questioning without an attorney, he had the right to stop answering questions at any time. (Tr. at 14-15;

---

[6] Detective McBride testified that she had been advised by the Coweta County Sheriff's deputies that Stevenson was violent at the time of his arrest, and therefore, they left him handcuffed during the interview. (Tr. at 10, 20). On cross-examination, Stevenson's counsel asked if Detective McBride was aware that Stevenson had been tased, but Detective McBride testified that she was unaware of that at the time she interviewed him. (Tr. at 20).

[7] See Miranda v. Arizona, 384 U.S. 436 (1966).

[8] Prior to interviewing Stevenson, Detectives McBride and Hamby also asked him if he had anything to eat or drink to which Stevenson replied that he did not want to eat the food because he believed it was being poisoned. (Tr. at 9, 20-21, 23). The detectives also ascertained that Stevenson had an eighth grade education and could read. (Tr. at 14, 16; Gov. Ex. 1).

Gov. Ex. 1). After Detective McBride finished reading Stevenson his rights and the detectives ascertained that Stevenson understood his rights,[9] they asked Stevenson if he was willing to answer questions, and Stevenson agreed to speak with the detectives, signed the waiver of rights portion of the form,[10] and waived his rights. (Tr. at 15; Gov. Ex. 1).

Detective McBride proceeded to interview Stevenson at which time Stevenson made certain incriminating statements. (Tr. at 10). After the interview, which lasted approximately one hour, Detective Hamby prepared a summary of the statement provided by Stevenson, read the statement aloud to Stevenson, and then presented it to Stevenson for his signature. (Tr. at 10, 16-17; Gov. Ex. 1A). Stevenson reviewed

---

[9] Detective McBride testified that Detective Hamby asked Stevenson to read aloud the sentence above the rights, which states, "Before we ask you any questions, you must understand your rights." (Tr. at 15; Gov. Ex. 1). Stevenson complied and then placed his initials beside that statement. (Tr. at 15; Gov. Ex. 1).

[10] The Waiver of Rights portion of the form reads as follows:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Tr. at 15; Gov. Ex. 1). The word "coercion" in this portion of the form was underlined twice and Detective McBride testified that Detective Hamby underlined that word and specifically ensured that Stevenson understood what it meant. (Tr. at 21-22).

the statement, initialed the top and bottom of each page of the three-page statement; made corrections, which he also initialed; and then placed his signature on the last page of the statement. (Tr. at 17-18; Gov. Ex. 1A).

Detective McBride testified that though Stevenson was emotional, he did not appear to be agitated, he appeared to understand the questions asked of him and responded appropriately to those questions, and he did not appear to be under the influence of any alcohol or drugs. (Tr. at 10-11, 19, 21).[11] The detectives did not make any threats or promises to induce Stevenson to waive his rights and agree to speak with them, nor did they display any force or raise their voices at any time during the interview. (Tr. at 10-11). In fact, the only time Stevenson was even physically touched during the interview was when Detective Hamby reached across the table to wipe away tears from Stevenson's face with a tissue and to assist him in wiping his nose with the tissue. (Tr. at 9). Stevenson never requested the presence

---

[11] Although Stevenson made several statements to the detectives regarding trying to get away from Tennessee but trying to get to Nashville and also trying to get to Washington, D.C., to speak with the President, Detective McBride testified that none of his statements gave her any concern for Stevenson's mental state, but that the statements actually made sense "in the order that he was giving them to us." (Tr. at 22-23).

of counsel and he did not at any time indicate a desire to end the interview. (Tr. at 15, 24-25).[12]

## C.    The August 3, 2011, Photographic Lineup

Subsequent to Stevenson's arrest by the Coweta County Sheriff's Department, the Federal Bureau of Investigation ("FBI") became involved in the investigation of attempted robbery of the Bank of America due to the possible connection to a robbery of a McDonald's restaurant that occurred on June 5, 2011. (Tr. at 42-43). In particular, DCPD detectives advised FBI Special Agent Michael T. Greene ("Agent Greene"), that they suspected that the individual who had attempted to rob Bank of America on June 6, 2011, was the same individual who had robbed the McDonald's restaurant the day before. (Id.).

Based on this information, Agent Greene utilized the photo array compiled by Detective Davis and showed it to two witnesses from the McDonald's robbery on August 3, 2011. (Tr. at 44-45; Gov. Ex. 3).[13] Agent Greene interviewed the two witnesses separately at a back table in the McDonald's restaurant and did not let

---

[12] Sometime shortly after the interview, Stevenson was transported to DeKalb County where he had pending charges, and at that point, he invoked his <u>Miranda</u> rights and asked to speak to an attorney. (Tr. at 23-24).

[13] One of the witnesses was the employee who was actually robbed and the other witness was an employee who was working the counter on the day of the robbery. (Tr. at 45).

either witness know beforehand that he was going to conduct a photographic lineup. (Tr. at 45). Prior to showing each witness the photo array, Agent Greene verbally advised them to carefully look at the photographs, that "[t]here was no guarantee that the individual that was involved in the robbery was in the photographic lineup," and that "[i]f they don't see the individual in the photograph, then don't pick anybody." (Tr. at 47, 49). Both witnesses indicated that they understood and neither of them had any questions. (Tr. at 47). Only one of the witnesses was able to make an identification, and Agent Green did not in any way or manner suggest to the witnesses which photograph they should select. (Tr. at 48-50).

## II. DISCUSSION

Stevenson moves to suppress identifications of him made by two witnesses on June 6, 2011, arguing that they are unreliable as the product of an unduly suggestive photographic lineup. [Doc. 30 at 3-7].[14] Stevenson also makes two arguments for the suppression of all post-arrest incriminating statements made on June 7, 2011. [Id. at 7-8]. First, Stevenson contends that he did not knowingly,

---

[14] Although Stevenson does not make any specific arguments with regard to the August 3, 2011, photographic lineup, see generally [Doc. 30], the Court will nonetheless address the legality of this lineup since Agent Greene utilized the same photo array from June 6, 2011, to show to the two witnesses from the McDonald's robbery.

intelligently, and voluntarily waive his <u>Miranda</u> rights. [<u>Id.</u>]. Second, Stevenson argues that he did not freely and voluntarily make statements during the interview. [<u>Id.</u> at 8]. The Court will address the merits of each of these arguments.

## A. <u>Photographic Identification Evidence</u>

"In the Eleventh Circuit, a two step analysis is used to determine whether the admission of an out-of-court identification violates due process." <u>United States v. Perkins</u>, Criminal Case No. 1:10–CR–97–JEC–LTW, 2011 WL 2294163, at *6 (N.D. Ga. Apr. 21, 2011), adopted by 2011 WL 2268055, at *1 (N.D. Ga. June 8, 2011) (citation omitted) (<u>citing</u> <u>United States v. Diaz</u>, 248 F.3d 1065, 1102 (11th Cir. 2001)); <u>see also</u> <u>Perry v. New Hampshire</u>, 132 S. Ct. 716, 720, 722 (2012); <u>United States v. Knight</u>, 382 F. App'x 905, 907 (11th Cir. 2010) (per curiam) (unpublished). "First, a court must determine if the original identification procedures were unduly suggestive." <u>Perkins</u>, 2011 WL 2294163, at *6 (citation omitted). "Only if the answer to that question is yes, does the court continue the inquiry into whether, under the totality of the circumstances, the identification was nonetheless reliable . . . ." <u>United States v. Maxime</u>, No. 09-20470 CR MARTINEZ, 2010 WL 2635097, at *1 (S.D. Fla. June 9, 2010), adopted by 2010 WL 2635099, at *1 (S.D. Fla. June 30, 2010) (citation and internal marks omitted). "'[R]eliability is the linchpin in determining the

admissibility of identification testimony.'" United States v. Celis-Sosa, Criminal Action File No. 4:10–CR–43–RLV–WEJ, 2011 WL 2149345, at *3 (N.D. Ga. May 11, 2011), adopted by 2011 WL 2160758, at *1 (N.D. Ga. May 31, 2011) (alteration in original) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).

"In evaluating the suggestiveness of a photographic array, courts consider the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves." United States v. Moulton, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *12 (N.D. Ga. Nov. 22, 2010), adopted by 2011 WL 902639, at *10 (N.D. Ga. Mar. 14, 2011) (citations omitted). Therefore, "showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003) (citing Simmons v. United States, 390 U.S. 377, 383 (1968)); see also United States v. Walker, 199 F. App'x 884, 886-87 (11th Cir. 2006) (per curiam) (unpublished). Stevenson has the burden of proving that the identification procedure was impermissibly suggestive. Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988).

Stevenson argues that the photo array was unduly suggestive because he "is the only individual with his head tilted and appearing smaller than the other

photos." [Doc. 30 at 4]. Additionally, Stevenson argues that his photo "is one of two where there is a lock of hair on the forehead" and that the "background and other features of the photo also make [him] stand out." [Id. at 4-5]. However, a defendant in a lineup does not have to be surrounded by others identical in appearance, and a lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from others. United States v. Smith, 148 F. App'x 867, 874 (11th Cir. 2005) (per curiam) (unpublished); see also Cikora, 840 F.2d at 896-97 (district court did not clearly err by admitting identification where only defendant's photograph in lineup had height markings in background and defendant was a different race than several other subjects); Watson v. Harrison, No. CV 06-3626-SJO (JCR), 2008 WL 2163940, at *7 (C.D. Cal. May 12, 2008). But see O'Brien v. Wainwright, 738 F.2d 1139, 1141 (11th Cir. 1984) (color photograph displayed with five other black-and-white mug shots "stuck out like a sore thumb").

Indeed, "[i]f there is nothing inherently prejudicial about the presentation, such as the use of a very small number of photographs or the use of suggestive comments, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." Perkins, 2011 WL 2294163, at *6 (second alteration in original) (citation and

internal marks omitted). The Eleventh Circuit and other courts have held that if the subjects in a lineup have "substantial similarity in facial features, complexion, facial hair, and general body type and appearance," the lineup is not unduly suggestive. Smith, 148 F. App'x at 874-75 (internal marks omitted); see also Knight, 382 F. App'x at 907 (photo array not impermissibly suggestive where defendant was of a lighter complexion than four of the other individuals in a six-photo array and where the background lighting was slightly different); United States v. Anderson, 156 F. App'x 218, 220-21 (11th Cir. 2005) (per curiam) (unpublished); United States v. Rose, 362 F.3d 1059, 1066 (8th Cir. 2004) (photographic lineup not unduly suggestive although defendant's eyes may have appeared closed in his photograph and his hair was shorter than the rest, where basic physical features of others were consistent with description provided by witness and generally similar to defendant's features); United States v. Burbridge, 252 F.3d 775, 780 n.5 (5th Cir. 2001) (that defendant was the only one in photographic lineup with black t-shirt not impermissibly suggestive); United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (photo spread comprised of African-American men with similar features to the African-American suspect was proper).

The Court finds that the photographic array, consisting of six black and white photographs of African-American males, is not unduly suggestive because

Stevenson's photograph is sufficiently similar to the others in size, details, and manner of presentation. The photographs each depict African-American males similar in age and with similar hairstyles, body build, and skin complexions. (Gov. Ex. 3). Likewise, each photograph is a facial shot, not a side view, each depicts the same profile consisting of the shoulders, neck, and face, and each subject is dressed in similar dark-colored crew neck t-shirts, not in prison garb. (Id.). The photographs are all the same size, and the subjects themselves occupy approximately the same amount of space in each photograph. (Id.). The differences cited by Stevenson are insignificant and do not render the array unduly suggestive. United States v. Gay, 423 F. App'x 873, 877 (11th Cir. 2011) (per curiam) (unpublished); see also United States v. Taylor, 19 F. App'x 62, 64 (4th Cir. 2001) (per curiam) (unpublished); Renteria v. Curry, No. 1:08-cv-01209-AWI-DLB (HC), 2009 WL 2985674, at *9 (E.D. Cal. Sept. 16, 2009) ("The fact that Petitioner's photo was slightly smaller in size than the others did not make the lineup overly suggestive such that Petitioner stood out and was more likely to be selected."); United States v. Brown, Criminal No. 06-126 (JBS), 2006 WL 3041085, at *4 (D.N.J. Oct. 25, 2006) (finding minor differences such as defendant's head being slightly tilted to one side did not render the photo array unnecessarily suggestive); Roldan v. Artuz, 78 F. Supp. 2d 260, 275 (S.D.N.Y. 2000), adopted at 262 (finding lineup not unduly

suggestive where suspect had different hairstyle from two of the four fillers, stating "[d]ifferential in hairstyles does not create an unduly suggestive lineup"). "Indeed, the array does not strike the Court as one that suggests one photo is more likely to be chosen over any other," United States v. Turner, Criminal Action No. 2:10-cr-15-WKW, 2010 WL 3880043, at *3 (M.D. Ala. Aug. 4, 2010), adopted by 2010 WL 3879965, at *3 (M.D. Ala. Sept. 28, 2010), and in fact, the evidence shows that it was not likely to be chosen over another since two witnesses were unable to identify anyone from the lineup and one witness chose someone other than Stevenson, (Tr. at 33; Gov. Ex. 2).

Furthermore, Detective Davis read each witness a standard admonishment, advising them that the suspect may or may not be pictured in the photo array, and there is no evidence that he suggested to the witnesses in any way or manner which photograph they should choose. (Tr. at 29-34, 36-37; Gov. Ex. 2). Detective Davis' testimony, see (Tr. at 32), also reveals that each witness "fully understood that the suspect was not necessarily among the photos presented to [him]," United States v. Turner, No. 2:10-CR-15-WKW, 2010 WL 3879965, at *2 (M.D. Ala. Sept. 28, 2010) (citation omitted); (Tr. at 32; Gov. Ex. 2); see also United States v. Storey, No. 95-3383, 97 F.3d 1465, 1996 WL 532654, at *1 (10th Cir. Sept. 17, 1996) (unpublished) (affirming district court's conclusion that photo array was not impermissibly

suggestive based on officer's efforts to create matching photographs, the similarities between the photographs and a similar admonishment to the witness). In fact, two witnesses were unable to identify the suspect in any of the photos and one witness identified someone who was not the suspect, <u>see</u> (Tr. at 33; Gov. Ex. 2), which further supports Detective Davis' testimony that he in no way suggested which photograph the witnesses should select. Therefore, Stevenson has failed to show that the presentation of the photo array was tainted by any suggestive comments by the DCPD detectives.

The Court finds that the views or angles presented of each subject, the details of the subjects' physical features, the fact that they all wore similar clothing, the size of the photographs, the fact that each was a black and white photo, and the manner of the presentation by Detective Davis weigh toward a finding that the photo array was not unduly suggestive. <u>See</u> <u>Anderson</u>, 156 F. App'x at 220-21; <u>Smith</u>, 148 F. App'x at 874-875; <u>Johnson</u>, 56 F.3d at 954. In sum, Stevenson's photograph does not make him conspicuous, and neither the array nor the presentation of the array by Detective Davis rendered the photo array impermissibly suggestive.[15] <u>See</u> <u>United</u>

_____

[15] For these same reasons, the photo array presented to the two witnesses from the McDonald's robbery on August 3, 2011, was not unduly suggestive. Indeed, Agent Greene utilized the same photographic lineup prepared by Detective Davis and showed it to each of the witnesses separately after verbally advising each of them that that the suspect may or may not be included in the lineup. (Tr. at 44-45,

States v. Sanchez, 24 F.3d 1259, 1263 (10th Cir. 1994) (finding that a six-person lineup in which the defendant was the only one with his eyes closed was not unduly suggestive); Cikora, 840 F.2d at 896-97 (although defendant's photograph had height markings in the background, and the defendant was a different race than several other persons photographed, the lineup was held not to be impermissibly suggestive); Watson, 2008 WL 2163940, at *7 (where all individuals in six-person lineup were of similar age and complexion, with extremely short hair, not unduly suggestive even though petitioner was only one who was bald and had a lip piercing). Since the June 6, 2011, photographic array was not unconstitutionally suggestive, the inquiry ends there, and the Court need not address the parties' arguments regarding reliability. Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987) ("We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry.").[16] Therefore, it is

---

47, 49; Gov. Ex. 3). In fact, Agent Greene testified that he did not in any way suggest to the witnesses which photograph they should choose, and this testimony is supported by the fact that only one of the witnesses was able to make an identification. (Tr. at 48-50). Accordingly, the Court finds that the photo array on August 3, 2011, was not unduly suggestive and to the extent Stevenson seeks to suppress the evidence derived therefrom, it is due to be denied.

[16] Stevenson's sole argument regarding the reliability of the identifications at issue centers around a special master report from the New Jersey Supreme Court concerning misidentifications by eyewitnesses. [Doc. 30 at 5-6]. However, the "recommendation that the identification testimony should not be suppressed in no

**RECOMMENDED** that Stevenson's motion to suppress identification evidence, [Doc. 13], be **DENIED**.

## B.    Statements

Stevenson moves to suppress all post-arrest incriminating statements made on June 7, 2011, arguing that he did not knowingly, intelligently, and voluntarily waive his Miranda rights and that he did not freely and voluntarily make statements to Detectives McBride and Hamby during the interrogation.  [Doc. 30 at 7-8].

**1.**    *Stevenson knowingly, intelligently, and voluntarily waived his Miranda rights.*

Stevenson made certain incriminating statements on June 7, 2011, which he now seeks to suppress.  (Tr. at 10; Gov. Ex. 1A).  It is undisputed that Stevenson was in custody at the time he made these statements, and that he was subjected to an "interrogation" by Detectives McBride and Hamby after being advised of his Miranda rights from a standard form.  (Tr. at 12; Gov. Ex. 1).  There is also no genuine question that Stevenson signed the waiver portion of form.[17]  (Tr. at 15; Gov.

---

way prohibits [Stevenson] from cross-examining the pertinent witnesses at trial as to any inconsistencies or discrepancies in their testimony or otherwise questioning them with respect to the procedures used during the identification show-up and the reliability of any positive identifications made." United States v. Rodger, No. CR 109-040, 2010 WL 2643268, at *20 (S.D. Ga. Apr. 16, 2010), adopted by 2010 WL 2643267, at *4 (S.D. Ga. June 30, 2010) (footnote and citations omitted).

[17] In his initial motion to suppress, Stevenson argued that his signature on the waiver form appeared to be different from the signature at the end of his statement,

Ex. 1). Thus, the issue is whether Stevenson knowingly, intelligently, and voluntarily waived his Miranda rights.

"The government bears the burden of proving by a preponderance of evidence that [Stevenson] validly waived [his] *Miranda* rights." United States v. Harrold, 679 F. Supp. 2d 1336, 1349 (N.D. Ga. 2009), adopted at 1338 (citing Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997)). "In *Miranda*, the Supreme Court acknowledged that custodial interrogations, by their very nature, create 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" United States v. Degaule, 797 F. Supp. 2d 1332, 1377 (N.D. Ga. 2011), adopted at 1344 (quoting Miranda, 384 U.S. at 467). "Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* established certain procedures officers must follow." Id. at 1377-78. "Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention

---

see [Doc. 12 at 1], insinuating that the detectives may have forged his signature. However, there is absolutely no evidence that the detectives forged Stevenson's signature on any document, and the Court finds credible Detective McBride's testimony that Stevenson signed both the waiver form and the prepared summary of his statement. (Tr. at 15, 17-18); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder).

to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" Id. at 1378 (alterations in original) (quoting Miranda, 384 U.S. at 468-70). "*Miranda* further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings." Id. "'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" Id. (quoting Miranda, 384 U.S. at 473-74). "'If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.'" Id. (quoting Miranda, 384 U.S. at 474).

"A defendant may waive his *Miranda* rights 'provided the waiver is made voluntarily, knowingly, and intelligently.'" United States v. Vazquez, 406 F. App'x 430, 432 (11th Cir. 2010) (per curiam) (unpublished) (quoting Miranda, 384 U.S. at 444). This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, *3 (N.D. Ga. Aug. 10, 2007) (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "To find a waiver involuntary, 'coercive police activity is a necessary predicate.'" United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *6 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (quoting Connelly, 479 U.S. at 167). "Therefore, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." United States v. Maddox, Criminal Case No. 3:10-CR-004-JEC-RGV, 2010 WL 4312922, at *11 (N.D. Ga. Sept. 7, 2010), adopted by 2010 WL 4312905, at *1 (N.D. Ga. Oct. 22, 2010) (citation and internal marks omitted).

In addition, "[a] valid waiver . . . requires more than just a finding of voluntariness. . . . [A] waiver of *Miranda* rights must also be knowing and intelligent." Id. at 12 (citation and internal marks omitted). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation

omitted). "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a requisite level of comprehension." <u>Maddox</u>, 2010 WL 4312922, at *12 (alteration in original) (citation and internal marks omitted). "However, an express oral or written waiver of *Miranda* is strong proof of the validity of the waiver." <u>Id.</u> (<u>citing</u> <u>United States v. Stephens</u>, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002)); <u>see also</u> <u>Vazquez</u>, 406 F. App'x at 433 (<u>citing</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).

In the present case, Stevenson was neither coerced nor threatened into waiving his rights. (Tr. at 9-11). Stevenson was read his <u>Miranda</u> rights and was also asked to read them himself. (Tr. at 12, 14-15, 21-22; Gov. Ex. 1). Specifically, Stevenson was advised that he had the right to remain silent and that any statements he made could be used against him in court. (Tr. at 14-15; Gov. Ex. 1). Detective McBride further advised Stevenson that he had the right to speak to an attorney, to have one present during the questioning, and to have one appointed for him if he could not afford one. (<u>Id.</u>). Stevenson then waived those rights by signing a written waiver and proceeded to make statements. (Tr. at 10, 15, 21-22; Gov. Ex. 1).

When Detective McBride advised Stevenson of his <u>Miranda</u> rights, Stevenson did not ask her to repeat anything, ask any questions, or give any indication that he did not understand what was being read. (Tr. at 10-11, 15); <u>see also</u> <u>Harrold</u>, 679 F.

Supp. 2d at 1351. There is no evidence that Stevenson was harassed or coerced in any way by Detectives McBride or Hamby or any other law enforcement officer, or that the detectives made any promises or inducements to obtain his waiver. See (Tr. at 10-11). The totality of these circumstances demonstrate that Stevenson voluntarily waived his Miranda rights. See United States v. Longoria, Criminal File No. 1:08-CR-362-7-TWT, 2009 WL 3366016, at *15 (N.D. Ga. Oct. 15, 2009), adopted at *1.

Stevenson also knowingly and intelligently waived his Miranda rights. Whether a suspect intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the accused. Edwards, 451 U.S. at 482. Here, when the detectives explained the content of the rights warning and waiver to Stevenson, he did not ask for clarification, stop the interview, request counsel, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver. (Tr. at 10-11, 15, 24-25). Indeed, Detective McBride clearly explained Stevenson's right to remain silent and to have counsel present, and she confirmed that Stevenson understood his rights. (Tr. at 14-15; Gov. Ex. 1).

Stevenson's sole argument that his waiver was not voluntary, knowing, and intelligent is premised on his assertion that he "had been tased, was emotional and was making statements that were indicative of a significant mental health issue."

[Doc. 30 at 7]. Stevenson also points out that he only had an eighth grade education. [Id. at 8]. However, "[t]he fact that a defendant suffers from a mental disability does not, by itself, render a waiver involuntary." United States v. Henry, Criminal Indictment No. 1:09–CR–0522–1–TCB–GGB, 2010 WL 5559207, at *9 (N.D. Ga. Dec. 7, 2010), adopted by 2011 WL 65762, at *1 (N.D. Ga. Jan. 7, 2011) (citation and internal marks omitted); see also United States v. Derisma, No. 2:09–cr–64–FtM–29SPC, 2012 WL 537553, at *7 (M.D. Fla. Feb. 18, 2012). "The low intelligence of a defendant also will not itself render a confession involuntary." United States v. Sanford, No. 3:06-cr-199-MEF, 2009 WL 2197373, at *7 (M.D. Ala. July 23, 2009), adopted at *1 (citation omitted); see also United States v. Cox, 509 F.2d 390 (D.C. Cir. 1974) (finding Miranda waiver valid despite defendant's fifth grade education, where defendant demonstrated to the court that he could read and discuss the Miranda warnings); United States v. White, 451 F.2d 696, 700 (5th Cir. 1971)[18] (finding Miranda waiver valid despite defendant's "below average I.Q., fifthgrade education, [and] poor reading ability," where officers read him his Miranda rights). "Instead, in the absence of other evidence of coercion, it must be

---

[18] Decisions of the Fifth Circuit rendered prior to October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

shown that the police took advantage of the defendant's mental limitations in securing a *Miranda* waiver." Sanford, 2009 WL 2197373, at *7 (citations omitted).

In this case, there is simply no evidence that the detectives took advantage of any possible mental limitations, and the testimony presented at the evidentiary hearing "indicates that the officers took numerous precautions to ensure that [Stevenson's] waiver of *Miranda* rights and his statement were voluntarily made." Id. at 8. Indeed, Stevenson acknowledged that he understood his rights and Detective Hamby even took the time to thoroughly explain certain words contained in the waiver portion of the form prior to Stevenson signing it and agreeing to waive his rights. (Tr. at 15; Gov. Ex. 1). Moreover, Stevenson's interaction with the detectives reveals that he was able to provide clear, coherent, and comprehensible responses to their questions. (Tr. at 10-11).[19] In fact, Stevenson's invocation of his Miranda rights and request to speak to counsel after he was transported to DeKalb County indicate that he fully understood and was aware of the consequences of waiving his rights. Under the totality of the circumstances here, the Court finds that Stevenson's waiver of his Miranda rights was voluntary and that he understood the

_____

[19] Furthermore, the fact that Stevenson may have been tased at the time of his arrest is not sufficient to render his waiver involuntary absent any evidence of a lasting diminished mental capacity. See United States v. Williams, No. 2:05-CR-00441-KJD-LR, 2006 WL 2864105, at *5 & n.2 (D. Nev. Oct. 3, 2006), adopted at *2.

nature and consequences of his decision.  See <u>Moore v. Dugger</u>, 856 F.2d 129, 132 (11th Cir. 1988) (finding mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness; the fact that defendant was generally calm and responsive during the interview, that he did not appear confused, and that he understood what was being asked of him established a valid waiver of <u>Miranda</u> rights despite his low IQ).

**2.**    *Stevenson freely and voluntarily made statements to the detectives*

Aside from the mandates of <u>Miranda</u>, whether a statement was voluntarily given must be examined in light of the totality of the circumstances.  See <u>Schneckloth</u>, 412 U.S. at 226; <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003). "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" <u>United States v. Villaverde-Leyva</u>, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (<u>quoting</u> <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989)); <u>see also</u> <u>Schneckloth</u>, 412 U.S. at 225; <u>Hubbard</u>, 317 F.3d at 1252.  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of

any physical force against him, or the use of any promises or inducements by police." Id. (citation omitted) (citing Schneckloth, 412 U.S. at 226).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement: "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. Those cases where courts have found confessions to be involuntary "have contained a substantial element of coercive police conduct." Connelly, 479 U.S. at 164. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted).

In this case, all of the factors point in the direction of voluntariness. Stevenson was only interrogated one hour, see (Tr. at 10), which is a reasonable amount of time, see Martin v. Wainwright, 770 F.2d 918, 927 (11th Cir. 1985), modified on other grounds, 781 F.2d 185, 186 (11th Cir. 1986) (per curiam) (no coercion in spite of 5 hours of interrogation). There is no evidence that the agents threatened Stevenson in any manner, or otherwise applied force to him during the interrogation. (Tr. at 9-11). "While [Stevenson] was handcuffed, the mere act of handcuffing did not

make his waiver or subsequent confession involuntary." <u>Villaverde-Leyva</u>, 2010 WL 5579825, at *12 (<u>citing</u> <u>Shriner v. Wainwright</u>, 715 F.2d 1452, 1456 (11th Cir. 1983) ("'The use of handcuffs does not establish coercion.'")). There is also no evidence that the detectives made any promises or inducements to obtain Stevenson's statements. (Tr. at 10-11). During the interrogation, Stevenson never showed a desire to end the questioning,[20] never asked for counsel, and never indicated that he did not understand the questions he was being asked. (Tr. at 15, 24-25). Considering the totality of the circumstances, there is no basis for concluding that the entire sequence of events brought about an involuntary confession. Therefore, the Court **RECOMMENDS** that Stevenson's motion to suppress statements, [Doc. 12], be **DENIED**.

---

[20] Stevenson points out that Detective Hamby actually prepared the statement and argues that "all he had to do to get the interrogation to stop was sign," <u>see</u> [Doc. 30 at 8]; however, this argument overlooks the fact that at the time Detective Hamby presented Stevenson with the prepared statement for him to review and sign, the interrogation had already ceased, <u>see</u> (Tr. at 17-18; Gov. Ex. 1A). In fact, during this exchange, Stevenson was even allowed to make corrections to the prepared statement in order to ensure that the statement accurately reflected everything he had told the detectives during the interrogation. <u>See</u> (<u>id.</u>). Therefore, Stevenson's argument in this regard is without merit.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Stevenson's motions to suppress statements and identification evidence, [Docs. 12 & 13], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO RECOMMENDED** and **ORDERED**, this 7th day of March, 2012.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE